UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORRETT EWEN,

                            Plaintiff,

        -v-

ANDREW SAUL, Commissioner of Social Security,

                            Defendant.

CIVIL ACTION NO.: 19 Civ. 9394 (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE**, United States Magistrate Judge:

## I.        INTRODUCTION

Plaintiff Orrett Ewen ("Mr. Ewen") commenced this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g).  (ECF No. 1).  He seeks review of the decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying his application for Disability Insurance Benefits ("DIB") under the Act.  (Id.)  Mr. Ewen contends that the decision of the Administrative Law Judge ("ALJ") dated October 11, 2018 (the "ALJ Decision") was erroneous, not supported by substantial evidence, and contrary to law, and asks the Court to remand for a new hearing to reconsider the evidence.  (ECF No. 16 at 5).

The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  On March 17, 2020, Mr. Ewen filed a motion for judgment on the pleadings (ECF No. 15) ("Mr. Ewen's Motion"), and on June 6, 2020 the Commissioner cross-moved (ECF No. 20) (the "Commissioner's Motion").  For the reasons set forth below, Mr. Ewen's Motion (ECF No. 15) is GRANTED and the Commissioner's Motion (ECF No. 20) is DENIED.

## II.   <u>BACKGROUND</u>

### A.  <u>Procedural History</u>

On December 12, 2016, Mr. Ewen filed an application for DIB,[1] alleging that he had been unable to work since February 19, 2016.  (SSA Administrative Record ("R.") 15, 164 (ECF No. 14)).  On February 27, 2017, the SSA denied Mr. Ewen's application, finding that he was not disabled. (R. 15, 93).  On March 6, 2017, Mr. Ewen filed a written request for a hearing before an ALJ. (R. 15, 161).  On August 9, 2018, he appeared before ALJ Vincent M. Cascio for an evidentiary hearing.  (R. 36–74).

On October 11, 2018, ALJ Cascio issued his Decision finding that Mr. Ewen was not disabled under the Act.  (R. 12–30).  He found that Mr. Ewen had ten severe impairments — obesity, cervical spine herniations, lumbar spine herniations, cervical and lumbar radiculitis, bilateral knee derangement, post-concussion syndrome, sleep apnea, unspecified dementia, other amnesia, and atherosclerotic heart disease — but concluded that the severity of these impairments did not meet or medically equal the requisite criteria for a finding of disability. (R. 17–18).

On August 20, 2019, the SSA Appeals Council denied Mr. Ewen's request for review of the ALJ Decision.  (R. 1–5).  On October 10, 2019, Mr. Ewen filed a Complaint in this Court.  (ECF No. 1).  Mr. Ewen argues that ALJ Cascio improperly weighed the medical evidence regarding his mental impairments and failed to properly evaluate his subjective allegations.  (ECF No. 16).

---

[1] In order to quality for DIB, one must be both disabled and insured for benefits.  42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.120, 404.315(a).  The last date a person meets the insurance requirement is the date by which the claimant must establish a disability.  Mr. Ewen met the insurance requirements through December 31, 2021, and thus his disability must have begun on or before that date to quality for DIB.  (R. 15).

Mr. Ewen raises two points in his Motion:  (1) that, in determining his residual functional capacity ("RCF"), the ALJ failed to properly consider the limiting effect of his severe cognitive and mental health impairments; and (2) that the ALJ failed to properly evaluate Mr. Ewen's subjective allegations as to his limitations.  (ECF No. 16).  The Commissioner argues that the ALJ Decision is supported by substantial evidence and should be affirmed.  (ECF No. 21).

### B.  Factual Background

#### 1.  Non-medical evidence

Mr. Ewen was born in 1974 and was 41 years old on April 1, 2016, his alleged disability onset date.  (R. 28).  He has a GED and engaged in past relevant work as a sanitation worker.  (R. 128).  On February 19, 2016, Mr. Ewen was in a car accident, which he alleges caused his physical and mental impairments (the "2016 Car Accident").  At the time of the ALJ hearing, Mr. Ewen lived with his wife and two children, who were then 19 and six years old.  (R. 43).

#### 2.  Medical evidence

##### a.  Dr. Louis Rose

Following the 2016 Car Accident, Mr. Ewen began treatment with orthopedic surgeon Dr. Louis Rose.  (R. 260).  On February 23, 2016, at his first appointment, Mr. Ewen complained of headaches and pain in his left shoulder, lower back, and both knees.  (R. 260–61).  He reported increased pain with carrying, prolonged sitting and standing, pushing and pulling, repetitive use, and lifting and twisting.  (R. 260–61).  Dr. Rose diagnosed joint derangement of the left shoulder, impingement syndrome of the left shoulder, bilateral knee pain, sprain of the lumbar spine, and post-traumatic headaches.  (R. 261–62).  Dr. Rose ordered two MRI's and prescribed physical therapy.  (R. 262).

On March 1, 2016, Mr. Ewen underwent an MRI of his left knee that revealed synovial effusion of the knee joint; medial reticulated soft tissue edema subcutaneously; marginal distal medial femoral spurring with lateral soft tissue swelling with strain of the distal iliotibial band causing marginal lateral, distal femoral, and proximal lateral tibial spurring; lateral patellar tilt and subluxation with patellofemoral chondromalacia and narrowing of the lateral patellofemoral joint compartment; and anterior cruciate ligament strain.  (R. 255–56).  On March 2, 2016, Mr. Ewen underwent an MRI of his left shoulder that revealed tendinosis/tendinopathy; hypertrophic acromioclavicular joint changes; edema of the peritendinous soft tissues lateral to the greater tuberosity of the humerus; fluid at the long head of the biceps tendon sheath; and subcortical reactive changes centrally and superiorly at the glenoid with overlying chondromalacia.  (R. 253–54).

At his March 8, 2016 appointment, Mr. Ewen noted the ongoing pain in his left shoulder, lower back, and left knee.  (R. 264).  Dr. Rose's physical exam showed a positive impingement sign of his left shoulder with decreased range of motion and strength and decreased range of motion and strength of his knees. (R. 265).  Diagnoses were unchanged.  (R. 265–66).

At his April 5, 2016 appointment, Mr. Ewen complained of new pain in his neck that radiated to his left arm. (R. 267).  The cervical spine examination demonstrated moderate muscle spasms with tenderness, decreased range of motion, and decreased strength.  (R. 268).  The lumbar spine exam showed mild to moderate tenderness and spasms with decreased range of motion in all planes.  (R. 269).  Dr. Rose noted that Mr. Ewen's left shoulder was still positive for impingement and had decreased range of motion and diminished strength.  (R. 269).  Mr. Ewen's

left knee had mild to moderate tenderness, decreased range of motion, and diminished strength. (R. 270).

Mr. Ewen continued to see Dr. Rose for further management of his neck, lower back, bilateral knee, and left shoulder pain throughout the remainder of 2016, with little change in his findings. (R. 277–90). At Mr. Ewen's December 2, 2016 appointment, Dr. Rose directed Mr. Ewen to continue his medications and resume physical therapy treatment. (R. 291–94).

On March 10, 2017, Mr. Ewen presented to Dr. Rose with similar complaints of neck, back, left shoulder, and bilateral knee pain. (R. 627–28). Dr. Rose's cervical spine examination revealed decreased sensation, moderate spasms with tenderness, and decreased range of motion and weakness. (R. 628). The lumbar spine exam noted that Mr. Ewen walked with an antalgic gait affecting his left lower extremity and had difficulty mounting and dismounting the examination table and rising from a seated position. (R. 628). Mr. Ewen had decreased sensation in the lumbar spine and decreased range of motion in all planes with diminished strength. (R. 629). The knee exam demonstrated bilateral tenderness, positive bilateral McMurray's tests with medial joint pain, and decreased bilateral knee range of motion and strength. (R. 629). Dr. Rose diagnosed Mr. Ewen with cervical disc displacement, lumbar disc displacement, left impingement syndrome, and bilateral knee pain. (R. 629–630).

A March 15, 2017 MRI of Mr. Ewen's cervical spine revealed left paracentral disc herniation, right paracentral disc herniation, and central posterior disc with central and foraminal narrowing. (R. 775–76). A March 15, 2017 MRI of Mr. Ewen's lumbar spine revealed disc herniations with central and foraminal narrowing. (R. 777).

### b.  **Multi-Specialty Pain Management Clinic**

On February 26, 2016, Mr. Ewen began treatment at the Multi-Specialty Pain Management Clinic with Dr. Brian Haftel.  (R. 470).  At this appointment, Mr. Ewen reported poor sleep quality secondary to his pain and difficulty with activities of daily living.  (R. 470–71).  Dr. Haftel's cervical spine exam showed decreased range of motion with bilateral tenderness, and positive Spurling's test.  (R. 471).  The lumbar spine examination revealed decreased range of motion, tenderness, positive bilateral straight leg raise, spasm, and difficulty with transitions from sitting to standing and climbing on and off the examination table.  (R. 472).  A bilateral knee examination revealed diminished range of motion, tenderness, and crepitus with flexion/extension.  (R. 472).  A left shoulder examination showed diminished range of motion, tenderness, and pain on extremes of motion.  (R. 472).  Dr. Haftel diagnosed Mr. Ewen with recurrent cervical and lumbar strain, recurrent bilateral knee sprain/strain, and left shoulder sprain/strain.  (R. 472).  Dr. Haftel administered cervical trigger point injections on March 24, 2016 and March 31, 2016.  (R. 474–77, 791–98).

As of April 2016, Mr. Ewen reported 70% alleviation of pain following injections, lasting two weeks.  (R. 478).  He continued to report bilateral knee, left shoulder, and lower back pain.  (R. 478).  Clinical findings and diagnoses remained unchanged and Dr. Haftel recommended that Mr. Ewen avoid strenuous activity and heavy lifting, and continue physical therapy.  (R. 478–81).  EMG testing on April 15, 2016 revealed right cervical and lumbar radiculitis.  (R. 780–86).

On May 17, 2016 Dr. Farhana Ahmed examined Mr. Ewen for increased muscle spasms to the left side of the neck and continued lower back, bilateral knee, and left shoulder pain.  (R. 482).  Her clinical findings mirrored previous findings of limited range of motion, tenderness and

weakness of the cervical spine, lumbar spine, left shoulder and both knees.  (R. 483–84).  Dr. Ahmed diagnosed cervical, lumbar, bilateral knee, and left shoulder sprain/strain, and prescribed Ibuprofen 600mg for pain.  (R. 485).

In June 2016, Mr. Ewen underwent lumbar paravertebral injections at the bilateral L5 level, which resulted in 50% alleviation of his pain for approximately a week.  (R. 486–89).  In July and August of 2016, Dr. Susan DiStasio administered lumbar epidural steroid injections at the L4-L5 and L5-S1 levels.  (R. 591–93, 813–21).

At his appointments on September 1, 2016 and October 5, 2016 with Dr. DiStasio, Mr. Ewen reported only some improvement of pain in the days following epidural injections.  (R. 376–77, 490–91).  Mr. Ewen also reported ongoing difficulties with activities of daily living such as bathing, carrying, climbing stairs, doing laundry, dressing, driving, toileting, cleaning, picking things up, shopping, sitting, sleeping, standing, and walking.  (R. 376–77, 490–91).  Physical examination findings remained the same and Mr. Ewen was diagnosed with recurrent cervical strain, cervical radiculopathy, recurrent lumbar strain, recurrent bilateral knee strain/sprain, and left shoulder strain/sprain, and was deemed 100% temporarily disabled.  (R. 377–78, 492–93).  At both appointments, Dr. DiStasio recommended L4-L5 and L5-S1 microdiscectomy and bilateral lower lumbar facet joint injection and at the September 1, 2016 appointment administered intraarticular facet joint blocks at the L3-L4 and L4-L5 levels.  (R. 376–79, 490–93).

On October 26, 2016, Mr. Ewen underwent a lumbar microdiscectomy with nuclear disc decompression at the L4-L5 and L5-S1 levels with Drs. DiStasio and Haftel.  (R. 400–02).  At his November 16, 2016 follow up appointment with Dr. Haftel, Mr. Ewen reported an 80% improvement for the three weeks following the procedure, but was since experiencing increasing

right-sided lumbar pain with radiation to the lower extremities.  (R. 417).  He also continued to complain of pain in his knees, left shoulder, and neck, and reported worsened pain with prolonged walking, sitting, and standing.  (R. 417).  Findings and diagnoses were unchanged from prior visits.  (R. 418–20).  On December 14, 2016 and January 25, 2017, the clinical findings remained unchanged, and Dr. Haftel noted that Mr. Ewen remained 100% disabled.  (R. 448–51, 838–45).

On March 27, 2017, Mr. Ewen returned to Dr. Haftel with ongoing complaints and his examination findings remained unimproved despite his treatment.  (R. 846).  Dr. Haftel maintained the diagnoses of recurrent cervical strain, cervical radiculopathy, recurrent lumbar strain, recurrent bilateral knee sprain/strain, and cervical and lumbar radiculitis.  (R. 846–49).  On May 23, 2017, Dr. Haftel reiterated these findings and again deemed Mr. Ewen 100% temporarily disabled.  (R. 850–53).

On July 18, 2017, Mr. Ewen again complained to Dr. DiStasio of pain to the neck, left shoulder, lower back, and left knee.  (R. 854).  He reported that he had a consultation with a spinal surgeon, who recommended fusion surgery, of which Mr. Ewen was wary.  (R. 854).  Objective findings remained the same, and Dr. DiStasio diagnosed recurrent cervical, lumbar, and bilateral knee strain; cervical radiculopathy; cervical and lumbar radiculitis; and left shoulder strain.  (R. 854–57).

From March 1, 2016 through July 24, 2017, Mr. Ewen attended physical therapy and chiropractic treatment for his neck, back, bilateral knees, and left shoulder several times a week. Treatment consisted of electrical stimulation, chiropractic manipulation, traction of the lumbar and cervical spines, massages, heat and cold therapy, myofascial release, and therapeutic

exercises; Mr. Ewen reported ongoing pain despite treatment.  (R. 343–75, 380–99, 403–16, 421–47, 452–69, 502–90, 594-611, 858–1063, 1064–258).

### c.  Center for Cognition and Communication

On February 29, 2016, Dr. Kim Busichio and Dr. Jason Brown conducted a neurobehavioral screen to assess Mr. Ewen's reported issues with attention and memory from the 2016 Car Accident.  (R. 299).  Specifically, Mr. Ewen reported headaches, and dizziness and that he was forgetting doctor appointments, the content of conversations, names, and places, and frequently misplaced items.  (R. 299).  Mr. Ewen also reported difficulty focusing, a need to re-read material several times, and a need to write tasks down to not forget them.  (R. 299).

The Raven's Standard Progressive Matrices Test assessed Mr. Ewen's intellectual functioning to be within the <3rd percentile.  (R. 300).  The Mindstreams battery cognitive functioning test revealed Mr. Ewen's memory, attention, verbal functioning and global cognitive scores to be in the <1st percentile, his executive function to be in the 3rd percentile, and his motor skills to be in the 42nd percentile.  ((R. 300).  The Rey Complex Figure Test assessed his visual memory and attention within the 46th percentile and then the 20th percentile after a 30-minute delay.  (R. 300).  On Digit Span testing, Mr. Ewen was only able to repeat five digits forward and three digits backward (placing him within the 9–10th percentile).  (R. 301).

Drs. Busichio and Brown diagnosed Mr. Ewen with post-concussion syndrome with secondary cognitive deficits and opined that he suffered impairments in verbal learning and memory; sustained visual attention and concentration; response inhibition; and verbal functioning.  (R. 301).  They recommended that Mr. Ewen begin cognitive behavioral therapy.  (R. 301).

The same day, Mr. Ewen underwent a NeuroTrax Brain Evaluation as a further assessment of his memory, executive function, attention, verbal function, and motor skills.  (R. 303).  Results revealed a global cognitive score of 56.9 (more than one standard deviation below average) with impairments in memory, executive function, attention, and verbal function.  (R. 303–12).

Beginning March 3, 2016, Mr. Ewen presented for cognitive rehabilitation therapy. During this first session, he had difficulty with attention, visual processing, executive functioning, memory, and visual and information processing, with only 40–50% accuracy at slow processing speeds.  (R. 313).  At his March 10, 2016 appointment, Mr. Ewen completed memory and word search tasks at 37–41% accuracy with slow processing speeds.  (R. 314).  Similarly, at his March 18, 2016 appointment, Mr. Ewen completed visual vocabulary scanning and visual spatial analysis tasks with 35–45% accuracy with very slow processing speeds.  (R. 315).  He exhibited difficulty with visual spatial exercises and the therapist noted he needed to improve his attention to visual detail and overall processing skills.  (R. 315).

Cognitive rehabilitation visits throughout April, May, and June 2016 revealed similar results and little progress; Mr. Ewen demonstrated continued slow pace and processing speeds, and 45–56% accuracy on memory and visual tests.  (R. 316–27).  In his July, August, and September 2016 visits, Mr. Ewen continued to have slow processing speeds when performing brain training exercises; his accuracy remained below 55% during all trials, and although increased complexity task performance was initiated, he completed them with 21–32% accuracy at slow processing speeds and with poor concentration.  (R. 328–33).  His improvement was deemed "slight."  (R. 334–38).  Throughout November and December 2016, Mr. Ewen's accuracy

remained below 50% (especially with memory and visual spatial skills testing) and his processing speeds remained slow.  (R. 340–42).

In appointments during January and February 2017, Mr. Ewen completed highly complex planning and organizational tasks and moderate complexity memory tasks with 40–55% accuracy (with planning and organization) and 38–44% accuracy (with memory tasks) and with very slow to slow processing speeds, often taking a significant amount of time to complete tasks.  (R. 631–39).  In a March 6, 2017 progress note, Mr. Ewen's therapist noted that he "continued to demonstrate impairment in memory, verbal function, and information processing speed, visual spatial, executive functions, attention and concentration."  (R. 640).  Although some improvements were noted, his global cognitive score only "slightly increased" and "continue[d] to be in the impaired range."  (R. 640).

During therapy appointments in April, May, and June 2017, Mr. Ewen exhibited ongoing difficulties; he was unable to complete complex executive functioning tasks (despite working with slow processing speeds) and exhibited very poor attention and concentration, exhibiting only 30% accuracy.  (R. 642–50, 686–89).  July 2017 tests revealed 44–52% accuracy and slow processing speeds, and Mr. Ewen continued to perform moderately complex tasks involving visual image reconstruction, visual memory/recall, visual perception, and visual spatial analysis at 50–59% accuracy.  (R. 651–53).

An August 14, 2017 brain MRI revealed selective atrophy of the left nucleus accumbens in association with impulse control disorder, deemed a possible manifestation of post-traumatic Mavridis' atrophy producing Parkinsonian symptoms.  (R. 733–34, 752, 761).  On February 8, 2018, Mr. Ewen underwent another NeuroTrax cognitive test, which demonstrated impairment

with executive function, attention, visual spatial memory, verbal function and memory (both immediate and delayed), problem solving, and working memory.  (R. 767–73).

### d.  Treatment at Mount Sinai Doctors - Westchester

In May 2017, Mr. Ewen began treatment with internist Dr. Arshia Nishat at Mount Sinai Doctors in Westchester.  (R. 677).  At his May 21, 2017 appointment, Mr. Ewen reported snoring and gasping for air during sleep with daytime sleepiness, fatigue, bilateral leg swelling, and intermittent chest pain.  (R. 677).  He also reported increased forgetfulness, inability to concentrate, and depression/sadness.  (R. 677).  Dr. Nishat diagnosed Mr. Ewen with morbid obesity, sleep apnea, edema, unspecified dementia, and essential hypertension, and referred him to a neurologist.  (R. 679–80).

On June 14, 2017, neurologist Dr. Vincci Ngan examined Mr. Ewen at Mount Sinai Doctors for continued memory issues, difficulty concentrating, forgetting passages he read, forgetting to do chores, and forgetting to flush the toilet.  (R. 686).  He also reported general poor mood and sleep.  (R. 686).  Examination revealed abnormal Montreal Cognitive Assessment ("MOCA") test results.  (R. 688).  Dr. Ngan diagnosed sleep apnea, depressive episodes, and amnesia, and deemed him memory issues likely the result of untreated sleep apnea, depressed mood, and head trauma from the 2016 Car Accident.  (R. 688–89).  On September 11, 2017 Mr. Ewen saw Dr. Ngan and complained of similar memory and attention issues, which had by now persisted for over a year.  (R. 694).  Dr. Ngan maintained his diagnoses of obstructive sleep apnea and amnesia.  (R. 694–97).  After his January 10, 2018 appointment with Dr. Nishat, his diagnoses were updated to include "unspecified dementia without behavioral disturbance."  (R. 698).

On January 24, 2018, neurologist Dr. Brijesh Malkani examined Mr. Ewen to evaluate his complaints of migraines and memory loss.  (R. 764).  Mr. Ewen reported being more forgetful since the 2016 Car Accident with impaired mood, sleep, and cognition.  (R. 764).  He also reported angry outbursts and impulsive lashing out at his wife and children.  (R. 764).  Dr. Malkani observed Mr. Ewen to have limited attention and processing, and diagnosed him with benign hypertension, Jacksonian motor partial seizure, and mild cognitive impairment.  (R. 776).

On January 31, 2018, Dr. Nishat completed a Physician Progress Report in which he noted Mr. Ewen's primary diagnoses as amnesia and dementia, secondary diagnoses of sleep apnea and morbid obesity with co-morbidities of hypertension and mood disorder.  (R. 758).  Dr. Nishat noted that she did not expect treatment to substantially improve Mr. Ewen's function and employability, and noted that Mr. Ewen's position had regressed.  (R. 759).  Dr. Nishat opined that Mr. Ewen was incapable of performing critical thinking and problem solving tasks (including simple math); reading; prolonged standing; bending or twisting at the waist or neck; squatting, climbing, or crawling (due to back pain); reaching above/below shoulder level (noting left shoulder pain); and using a computer (noting Mr. Ewen's amnesia and difficulty reading and writing).  (R. 759–60).

At his May 23, 2028 appointment with Dr. Nishat, Mr. Ewen complained of continued memory loss, cognitive impairments, attention deficits, and difficulties with problem solving.  (R. 1262–65).

### e.  Dr. Melissa Antiaris, SSA consultative psychologist

On February 9, 2017, Dr. Melissa Antiaris conducted a consultative psychiatric evaluation of Mr. Ewen in connection with his SSA application.  (R. 616).  At this examination, Mr. Ewen

denied a psychiatric history, but explained he was in cognitive therapy due to a concussion. (R. 616). He also reported his various spinal procedures, lower back pain, left arm and shoulder pain, and knee pain. (R. 616).

As to his current functioning, Mr. Ewen reported difficulty falling and staying asleep due to pain. (R. 616). He stated that since the 2016 Car Accident he had an increased appetite and weight gain with other depressive symptoms. (R. 616). He also explained that he had been very irritable and was experiencing anxiety symptoms. (R. 616). Mr. Ewen reported some difficulty with short term memory and concentration. (R. 616).

Dr. Antiaris's mental status examination found Mr. Ewen to be cooperative, with appropriate eye contact and normal posture and motor behavior. (R. 617). His speech was clear, and thoughts were coherent, but his attention was mildly impaired due to limited intellectual functioning. (R. 617). He could count and perform simple calculations but had difficulties with serial threes. (R. 617). Dr. Antiaris also noted that Mr. Ewen's recent and remote memory skills were mildly impaired and his cognitive functioning was in the below average range with a somewhat limited general fund of information. (R. 618).

As to activities of daily living, Dr. Antiaris noted that Mr. Ewen was able to dress, bathe, and groom himself, although sometimes his wife helped him due to his pain. (R. 618). He told Dr. Antiaris that his wife did most of the cooking, cleaning, laundry, and shopping because of his pain. (R. 618). He explained that he drove on occasion, but did not take any public transportation. (R. 618). Socially, he saw friends on occasion, and generally got along well with his wife and children, although he had been short with them lately, according to his wife. (R. 618).

Mr. Ewen stated that he attended physical therapy four times a week and is supposed to attend cognitive therapy twice a week, but that he did not go that often.  (R. 618).

Dr. Antiaris opined that Mr. Ewen had no limitations in his ability to follow and understand simple directions and instructions or perform simple tasks independently.  (R. 618).  She stated that he was mildly limited in his ability to maintain attention and concentration and a regular schedule, and that he had mild limitations in his ability to learn new tasks and perform complex tasks independently.  (R. 618).  She opined that Mr. Ewen's impairments were caused by cognitive deficits.  (R. 618).  She concluded that the "results of this examination appear to be consistent with some cognitive concerns, but in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis."  (R. 618–19).  Dr. Antiaris diagnosed Mr. Ewen with a minor neurocognitive disorder and stated that his prognosis was "good."  (R. 619).

### f.   Dr. Julia Kaci, SSA consultative internist

On February 9, 2017, Dr. Julia Kaci conducted orthopedic and neurological exams in connection with Mr. Ewen's SSA application.  (R. 620).  His chief complaints were his injuries from the 2016 Car Accident, including head trauma, and resulting pain in his lumbar spine, shoulders, and left knee.  (R. 620).  Mr. Ewen described constant, sharp lower back pain that he rated ten on a scale of ten and was exacerbated by walking more than two blocks and sitting more than 30 minutes.  (R. 620).  He described sharp bilateral shoulder pain and constant left knee pain.  (R. 620).  Mr. Ewen told Dr. Kaci that he did not perform any activities of daily living without help due to his pain.  (R. 621).

Mr. Ewen did not appear to be in acute distress, and did not need assistance during the exam.  (R. 621).  His cervical spine exam demonstrated full range of motion and no pain, spasms or trigger points.  (R. 621).  Mr. Ewen's shoulders showed some limited range of motion, but no inflammation or instability.  (R. 621).  His thoracic and lumbar spine showed limited range of motion, with tenderness on palpation of the spinal and left paraspinal musical.  (R. 622). The straight leg raises were positive bilaterally in a supine position.  (R. 622).

In her concluding medical source statement for the orthopedic portion of the exam, Dr. Kaci opined that Mr. Ewen had moderate limitations to sitting, standing, walking, going up and down the stairs, kneeling, squatting, bending, lifting, carrying, pushing, and pulling.  (R. 622).

During the neurological portion of the exam, Mr. Ewen described daily headaches on waking that were pounding, and rated the pain a ten on a scale of ten.  (R. 623).  He said that the headaches lasted about an hour and were associated with sound and light sensitivity.  (R. 623). He also complained of memory loss and difficulty finding words and reading.  (R. 623).  He told Dr. Kaci that he was attending cognitive therapy once or twice a week.  (R. 623).

In the "mini mental status" evaluation, Dr. Kaci noted that Mr. Ewen was appropriately dressed, and had normal registration, but could not recall three words after a five-minute span. (R. 624).  Dr. Kaci diagnosed Mr. Ewen with post-concussion syndrome, chronic lower back pain, chronic left knee pain, and bilateral shoulder pain.  (R. 625).  In her neurological medical source statement, Dr. Kaci noted the same moderate physical limitations and added that Mr. Ewen needed to avoid bright lights and noisy environments.  (R. 625).

C. **Administrative Proceedings**

    1. **Hearings before ALJ Cascio**

On August 9, 2018, ALJ Cascio held a hearing, at which Mr. Ewen was represented by counsel.  (R. 36–74).  The ALJ started the hearing by explaining the importance of Mr. Ewen's testimony, the role of the vocational expert, and the nature of the proceeding.  (R. 38–42).  Next, ALJ Cascio inquired into Mr. Ewen's current living situation, and established that Mr. Ewen had not worked since the 2016 Car Accident.  (R. 42–45).

The ALJ then asked Mr. Ewen to describe his physical symptoms since his alleged onset date.  (R. 45).  Mr. Ewen testified that after the 2016 Car Accident, he had been diagnosed with herniations in his neck, along with nerve damage, and that his doctors had recommended a fusion surgery for his lower back.  (R. 45–46).  Mr. Ewen explained that he suffered head trauma and subsequently had to do memory therapy.  (R. 46).  When testifying about this therapy, Mr. Ewen but had difficulty remembering the details of the appointments, and explained other problems with his short-term memory.  (R. 46).  He testified that his wife was becoming frustrated with his memory failures, which were not present before the accident.  (R. 47).

ALJ Cascio next briefly inquired into the effect Mr. Ewen's described symptoms had on his daily life and everyday activities.  Mr. Ewen stated that he was able to do "some driving" mostly "short rides" to doctor appointments (R. 44), and that he would be able to take public transportation if he was able to sit.  (R. 52).  He explained that he could only sit or stand in one place for ten to fifteen minutes before needing to change positions due to the pain in his lower back.  (R. 49, 55).  He explained he could lift eight pounds, but could not bend over to reach his toes, and was unsure of whether he could even reach his knees.  (R. 49–50).  He also testified

that he had limitations with reaching overhead with his left arm because it pulled the muscles in his neck and caused him pain.  (R. 50).

Mr. Ewen explained that he is able to take a shower, but that his wife has to wash his back and feet, and help put on his socks and pants.  (R. 51).  He stated that his wife and daughter did the household chores and laundry and most of the shopping.  (R. 51–52).  During the day, Mr. Ewen mostly watched television.  (R. 52).  He explained that he would lay down all day if he could, to relieve the pain, but that in a good day he would lay down two to three times, for about 30 minutes each time.  (R. 55).  Finally, he explained that after the accident, bright lights and noise triggered migraines and irritability.  (R. 56–57).

Mr. Ewen testified that he did not take narcotic pain medications because of the risk of addiction, but took Motrin regularly.  (R. 48).  He explained that physical therapy only relieved his pain for about a week.  (R. 52).  The treatments for his neck and back, including steroid and nerve block injections, similarly only provided short-term relief.  (R. 52).

ALJ Cascio then took testimony from a vocational expert.  (R. 61).  ALJ Cascio asked whether there were any jobs in the national economy for a hypothetical individual that could perform light work, could occasionally climb ramps and stairs and occasionally balance, stoop and crouch, but could not climb ladders, ropes, scaffolds and could never crawl or kneel.  (R. 63).  In addition, this person had to avoid unprotected heights and hazardous machinery and was capable of working in an environment with a moderate sound level or with bright lights.  (R. 63).  This person could understand, remember and carry out simple, routine, repetitive work-related tasks.  (R. 63).  The expert testified that such an individual would not be able to perform Mr. Ewen's past work, but that there were other jobs available in the national economy.  (R. 63–64).

As a second hypothetical, the ALJ asked the vocational expert to consider a person who could perform a full range of light work, except could only lift and carry 30 pounds, was not restricted to driving, could walk and sit for eight hours in an eight hour day, but only stand for two hours. (R. 64). This individual was further limited to occasionally bending, twisting, squatting, crawling, climbing, bilateral reaching with frequent right-hand fine manipulation, had the same sound and light limitations, and same ability to carry out simple instructions. (R. 64). The expert opined that such a person could not perform Mr. Ewen's past work, but that there were other jobs available in the national economy. (R. 64–65).

For a third hypothetical, the ALJ asked the expert to consider an individual with the same limitations as the first hypothetical, but rather than light work, such a person would be limited to sedentary work. (R. 66). The expert testified that such a person could not do Mr. Ewen's past work, but that there would be jobs available in the national economy that such a person could perform, such as a document preparer, toy stuffer or table worker. (R. 66–67).

Finally, ALJ Cascio asked the expert to consider the same limitations as the third hypothetical, but with the added element that the person would be off task twenty percent of the day, in addition to regularly scheduled breaks. (R. 67). The expert testified that there were no jobs available in the national economy for such a person. (R. 67).

Mr. Ewen's attorney then asked the expert to consider a worker that had occasional difficulty maintaining a regular schedule, learning new tasks, or performing any complex tasks. (R. 69). The expert did not believe any employer would tolerate such limitations. (R. 70). When asked if a worker would be able to perform any of the sedentary jobs identified, with the added

limitation to allow for only occasional reaching, handling and fingering, the expert stated that such a person would not be able to perform the identified sedentary jobs.  (R. 71–72).

### 2.  The ALJ Decision

On October 11, 2018, ALJ Cascio issued his Decision denying Mr. Ewen DIB benefits.  (R. 6). He held that, "[a]fter careful consideration of all of the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from February 19, 2016, through the date of this decision."  (R. 15).

ALJ Cascio followed the five-step disability determination process.  As a preliminary matter, the ALJ found that Mr. Ewen met the insured status requirements for his DIB application through December 31, 2021.  (R. 17).  At step one, ALJ Cascio found that Mr. Ewen had not engaged in substantial gainful activity since his alleged onset date.  (R. 17).  At step two, the ALJ found that Mr. Ewen had had ten severe impairments:  obesity, cervical spine herniations, lumbar spine herniations, cervical and lumbar radiculitis, bilateral knee derangement, post-concussion syndrome, sleep apnea, unspecified dementia, other amnesia and atherosclerotic heart disease. (R. 17).  At step three, the ALJ found that Mr. Ewen did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in the Act.  (R. 18).  (The impairments listed in 20 CFR Appendix 1, Subpart P, Part 404 are known as the "Listings").  The ALJ found that Mr. Ewen's impairments did not meet or medically equal Listing 1.04 (disorders of the spine), Listing 3.09 (chronic pulmonary hypertension), Listing 4.02 (chronic heart failure), Listing 4.04 (ischemic heart disease), or Listing 12.02 (neurocognitive disorders). (R. 18).  The ALJ noted that he considered Mr. Ewen's obesity at this step but found that his obesity had not reached a level to cause his other impairments to meet or functionally equal a

Listing.  (R. 18).  ALJ Cascio also stated that the mental impairments, singly and in combination, did not meet or medically equal Listing 12.02 and that in making that finding, he considered the Paragraph B and Paragraph C requirements of that Listing.  (R. 18).

ALJ Cascio found that Mr. Ewen had a mild limitation in understanding, remember, and applying information; mild limitation in interacting with others; moderate limitations in concentrating, persisting and maintaining pace; and mild limitations in adapting or managing himself, such that his mental impairments did not satisfy Paragraph B of Listing 12.02.  (R. 19). He also found the Mr. Ewen's mental impairments did not satisfy Paragraph C of Listing 12.02 because there was no evidence of only marginal adjustment or inability to adapt to environmental changes.  (R. 19).

ALJ Cascio assessed Mr. Ewen's RFC as being able to perform sedentary work with some limitations.  (R. 20).  The ALJ determined that Mr. Ewen was limited to sedentary work, could occasionally balance, stop, kneel, crouch and climb ramps and stairs, but could never crawl or climb ladders, ropes or scaffolds.  (R. 20).  In addition, he must avoid unprotected heights and hazardous machinery, is capable of working in an occupation with no more than a moderate sound level, and without bright lights, but that he could understand, remember, and carry out simple, routine, repetitive work-related tasks.  (R. 20).  ALJ Cascio concluded that Mr. Ewen's "allegations of disability [were] not fully consistent with the evidence of record."  (R. 21).

ALJ Cascio stated that his RFC finding was supported by the totality of the evidence and by certain portions of the SSA consulting examiners' opinions.  (R. 21–28).  At step four, ALJ Cascio found Mr. Ewen unable to perform his past relevant work, but at step five found that there were

jobs in the national economy that he could perform, such as a document preparer, toy stuffer, or table worker.  (R. 28–29).

### 3.  The Appeals Council decision

On August 20, 2019, the SSA Appeals Council denied Mr. Ewen's request for review of the ALJ Decision.  (R. 1–5).

### III.     DISCUSSION

#### A.  Applicable Legal Standards

##### 1.  Standard of Review

Under Rule 12(c), a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."   42 U.S.C. § 405(g).   A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error.  See Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).  Judicial review, therefore, involves two levels of inquiry.  First, the Court must decide whether the ALJ applied the correct legal standard.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008).  Second, the Court must decide whether the ALJ's decision was supported by substantial evidence.  Id.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the

evidence must also include that which detracts from its weight." <u>Longbardi v. Astrue</u>, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).  The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts. <u>See</u>, <u>e.g.</u>, <u>Carballo ex rel. Cortes v. Apfel</u>, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly. <u>See</u>, <u>e.g.</u>, <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant. <u>See</u>, <u>e.g.</u>, <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002); <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel. <u>See</u> <u>Lamay v. Comm'r of Soc. Sec.</u>, 562 F.3d 503, 508–09 (2d Cir. 2009). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources.  20 C.F.R. §§ 404.1512(b), 416.912(b).  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." <u>Casino-Ortiz v. Astrue</u>, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues,

including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. §§ 404.1520b, 416.920b.

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings:  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004).  If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the Court will remand the case for further development of the evidence or for more specific findings.  Rosa, 168 F.3d at 82–83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision.  Pratts, 94 F.3d at 39.  If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate.  See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

### 2.  Standards for benefit eligibility

For purposes of DIB, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(3)(A).  The Act also requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(3)(B).   In reviewing a claim of disability, the Commissioner must consider:   "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience."   Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

Under the applicable regulations, an alleged disability is evaluated under the sequential five-step process set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v) and 20 C.F.R. § 416.920(a)(4)(i)–(v). The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity.   If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.   If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.   If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.   Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof.   At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform.   See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).   In

meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid." Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

### B. Evaluation of the ALJ's Decision

The ALJ evaluated Mr. Ewen's claim pursuant to the five-step sequential evaluation process and concluded that he was not disabled within the meaning of the Act as of his alleged onset date.  (R. 15–30).  The Court finds that the ALJ failed to properly consider the limiting effects on Mr. Ewen's cognitive and mental impairments when conducting the Paragraph B analysis and when determining that Mr. Ewen had the capacity to engage in sedentary work.  In addition, remand for a further evidentiary hearing is appropriate because the ALJ failed to apply the proper legal standards in weighing Mr. Ewen's subjective allegations, in that he failed to consider all relevant evidence (or, failed to explain his implicit rejection of relevant evidence).

### 1. Mental impairment analysis – paragraph B

In considering Mr. Ewen's mental impairments under paragraph B of Listing 12.02, the ALJ erred by not appropriately considering, or explaining his rejection of, relevant evidence that conflicted with his assessment.  At step three in the five-step evaluation, the ALJ found that Mr. Ewen did not have an impairment or a combination of impairments that meets or medically equals the severity of a Listing.   (R. 19).   To satisfy paragraph B, there must be medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas of:  complex attention, executive function, learning and memory, language, perceptual-motor, or social cognition, and the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning, which are:  (1) understanding,

remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 CFR Appendix 1, Subpart P, Part 404 § 12.01.

As discussed further below, ALJ Cascio found that Mr. Ewen had only mild to moderate limitations in the broad areas of functioning, thus the paragraph B criteria were not satisfied. (R. 19).  However, the ALJ did not address or explain why he rejected substantial conflicting record evidence in the Paragraph B analysis, and in failing to do so committed legal error.

### a.  Understanding, remembering, or applying information

The ALJ found that Mr. Ewen had mild limitations in his ability to understand, remember, or apply information, primarily relying on the fact that Mr. Ewen was able to follow simple verbal instructions and drive a car.  (R. 19).  However, the ALJ did not discuss the directly conflicting record evidence that indicates more inhibiting memory problems as indicated in the cognitive behavioral therapy notes.  (See surpa § II.B.2.c).  The medical record shows that Mr. Ewen struggled with short term memory lapses even with persistent cognitive therapy.  (Id.)  In addition, he testified that he needed reminders to take his medicine, often forgot tasks, had to re-read material several times, and that his wife had to repeat conversations.  (R. 46–47).

In addition, the ALJ did not obtain enough information regarding Mr. Ewen's ability to drive to constitute substantial evidence in support of his finding of mild limitations in understanding, remembering or applying information.  ALJ Cascio relied on Mr. Ewen's testimony that he could "sometimes" drive for "short rides" to support this finding.  (R. 44).  The entirety of Mr. Ewen's testimony on his ability to drive was as follows:

ALJ: All right, and do you have a driver's license?

Mr. Ewen: Yes, sir.

ALJ: Do you currently drive? Some driving?

Mr. Ewen: Some driving.

ALJ: All right, like doctor's appointments, short rides?

Mr. Ewen: Doctor's appointments, just short rides.

(R. 44).  The ALJ did not inquire into how often Mr. Ewen drove, the length of a "short ride," whether he drove alone, whether Mr. Ewen ever had any difficulties while driving, such as attention or pain issues, and simply did not obtain enough information on this activity of daily living to justify its use as substantial evidence in support of this finding.

### b.  <u>Interacting with others</u>

ALJ Cascio found that Mr. Ewen had mild limitations in interacting with others, stating that although Mr. Ewen reported difficulty getting along with others because he had become impulsive, impatient, and demanding, he was able to shop in stores and spent time with friends and family.  (R. at 19).  The ALJ also supported the finding by stating that Mr. Ewen was pleasant and cooperative with his doctors.  (R. at 19).  The Court does not find any error with this determination, because the ALJ discussed the record evidence supporting his finding and the conflicting record evidence.  (R. 19).

### c.  <u>Concentrating, persisting, or maintaining pace</u>

With regard to concentrating, persisting or maintaining pace, the ALJ found that Mr. Ewen had moderate limitations.  (R. at 19).  He noted that Mr. Ewen reported difficulty with concentration, attention and concentration, but "he further reported he was able to drive a car and follow simple spoken instructions."  (R. 19).  ALJ Cascio stated that the consultative examiner

noted only mild impairment in attention and concentration, but did not address the large amount of record evidence from Mr. Ewen's cognitive therapy that demonstrated his difficulties with basic cognitive tasks, specifically with attention and concentration, slow pace, and poor accuracy. (See supra § II.B.2.c).  The ALJ did not address or give a basis for rejecting this conflicting evidence, which formed a large portion of the medical record, and should do so on remand.

### d.  Adapting or managing oneself

As to adapting or managing oneself, the ALJ concluded that Mr. Ewen had mild limitations. (R. 19).  ALJ Cascio supporting this finding by stating that although Mr. Ewen reported that he needed reminders for personal care, he was "able to prepare simple meals occasionally, wash dishes with breaks, assist with laundry, do light dusting, drive a car, shop in stores, drive his son to school, and visit with friends and family."  (R. 19).

This explanation is not a completely accurate summary of Mr. Ewen's testimony.  Mr. Ewen indicated a limited ability to drive, and much more limited activities of daily living.  (R. 51–52, 206–14).  For example, Mr. Ewen told both consultative examiners that he did not do any activities of daily living without assistance, and the record is unclear as to the limiting effect of Ewen's cognitive impairments on his ability to adapt and manage himself.  (R. 616, 620).  Mr. Ewen did not testify that he assisted with laundry, but rather that he would sometimes watch the laundry for his daughter, and that his wife and daughter did all of the cleaning.  (R. 51).  Similarly, Mr. Ewen did not testify that he drove his son to school, but rather that he sometimes took his son to school; Mr. Ewen also consistently stated that he could not go to the store alone. (R. 52, 616, 620).

On remand, Mr. Ewen's ability to adapt and manage himself should be further developed, potentially in the form of a treating source opinion, as one is notably missing from the record.

### 2. Evaluation of Mr. Ewen's subjective allegations

In considering a claimant's symptoms that allegedly limit his or her ability to work, the ALJ must first determine "whether there is an underlying medically determinable physical or mental impairment(s) — i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques — that could reasonably be expected to produce the claimant's pain or other symptoms." 20 C.F.R. §§ 404.1529(c), 416.929(c).  If such an impairment is found, the ALJ must next evaluate the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  To the extent that the claimant's expressed symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's credibility.  See Meadors v. Astrue, 370 F. App'x 179, 183–84 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350–51 (2d Cir. 2003).

Courts have recognized that "the second stage of [the] analysis may itself involve two parts."  Sanchez v. Astrue, No. 07 Civ. 931 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010).  "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)."  Id.  "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)]."

Id. (citing Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)).  If the ALJ does not follow these steps, remand is appropriate.  Id. at *15.

When a claimant reports symptoms that are more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects.  SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017).  These seven factors include:  (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. See Bush, 94 F.3d at 46 n.4.  ALJ Cascio did not develop and analyze all of these seven factors.

ALJ Cascio used Mr. Ewen's limited testimony regarding his daily activities as evidence that he is not disabled and can perform sedentary work, but failed to develop the record on the limiting effects of the severe impairments on his daily activities.  At the hearing, the ALJ did not ask for any specifics regarding Mr. Ewen's daily activities and did not inquire into the duration of his activities or how his impairments limited those activities, if medication relieved any of his symptoms, or what other measures, if any, Mr. Ewen used to relieve his pain effectively during such activities.  (R. 36–74).

In supporting his finding that Mr. Ewen was capable of sedentary work, the ALJ stated that Mr. Ewen's described daily activities were "as not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" first because Mr. Ewen could drive and use public transportation, which the ALJ explained "demonstrates concentration and persistence as well as the ability to deal with the stress inherent in the operation of ta motor vehicle" (R. 26–27). The ALJ further opined that an ability to drive demonstrated Mr. Ewen's ability to sit for a continuous period of time, and that the testimony that Mr. Ewen "would be able" to take public transportation spoke to his "ability to plan and work within schedules." (R. 27). Again, ALJ Cascio did not develop the record on Mr. Ewen's ability to drive such that it constituted substantial evidence on which to base the RFC. Mr. Ewen did not testify that he took public transportation, but rather that he thought he "would" be able to, if he could sit down. (R. 52). In fact, he told Dr. Antiaris that he did not take any public transportation. (R. 299). This evidence does not speak to Mr. Ewen's ability to plan or work within schedules.

The Court has already discussed the limited testimony regarding Mr. Ewen's ability to drive, but reiterates that the record evidence on this point does not demonstrate an ability concentrate and persist or sit for a continuous period of time, especially when the record demonstrates elsewhere that he has significant limitations in attention and concentration (see supra § II.B.2.c (progress notes from cognitive therapy)), and that he is moderately limited in his ability to sit for an extended period of time (see supra § II.B.2.f (SSA Consultative examiner Dr. Kaci's medical source opinion)).

The ALJ also supported his evaluation of Mr. Ewen's subjective allegations by pointing to Mr. Ewen's "routine and beneficial" treatment, the lack of "any non-conclusory opinions,

supported by clinical or laboratory evidence from a treating or examining physician indicating that [Mr. Ewen] is disabled," the fact that Mr. Ewen did not portray debilitating symptoms while testifying, and that he related well to his attorney and the ALJ at the hearing, such that Mr. Ewen's condition "does not preclude all work activity."  (R. 27).

Taking each in turn, the Court notes that the record does not evidence routine and beneficial treatment.  Mr. Ewen had spinal surgery, multiple injections, and weekly physical therapy, but still had pain and continually demonstrated limited range of motion.  (See supra § II.B.2).  Similarly, Mr. Ewen's cognitive therapy did not show substantial improvement in his concentration and attention or processing speeds.  (See supra § II.B.2.c).

The Court agrees that there was not a treating physician opinion in the record, but finds that it was the ALJ's duty to develop the record to obtain such an opinion.  See Beller v. Astrue, 12 Civ. 5112 (VB) (PED), 2013 WL 2452168, at *18 (S.D.N.Y. June 5, 2013) (concluding that the relationship between the treating physician rule and the duty to develop the record required the ALJ to request an RFC assessment from a treating physician); Peed v. Sullivan, 778 F. Supp. 1241, 1247 (E.D.N.Y. 1991) (remanding for failure to obtain an opinion from claimant's treating physician).  Further, Dr. Nishat did provide a physician progress report that noted that he did not expect treatment to substantially improve Mr. Ewen's function and employability, and noted that Mr. Ewen's progressed had retrogressed.  (R. 759).  Dr. Nishat opined that Mr. Ewen was incapable of performing critical thinking and problem solving tasks (including simple math); reading; prolonged standing; bending or twisting at the waist or neck; squatting, climbing, or crawling (due to back pain); reaching above/below shoulder level (noting left shoulder pain); and using a computer (noting Mr. Ewen's amnesia and difficulty reading and writing).  (R. 759–60).

ALJ Cascio only afforded "partial weight" to this opinion because it was "rendered for the purposes of long-term disability insurance," and the "opinion that [Mr. Ewen] is unable to think critically, problem, solve, read, or write, is not consistent with the medical evidence." (R. 25).

There are two errors with the ALJ's assessment of Dr. Nishat's opinions in her progress report. First, the fact that the report was not in connection with Mr. Ewen's SSA application does not render the non-conclusory opinions as to his limitations less valid, especially given that the report was based on longitudinal treatment at Mount Sinai Doctors. See Ryan v. Astrue, 5 F. Supp. 3d 493, 510–11 (S.D.N.Y. 2014) ("While it is true that no deference need be given to the conclusion that a claimant has a particular RFC, e.g., that a claimant is limited to performing sedentary work, . . . that fact does not exempt the ALJ from his obligation .. . . to explain why a . . . physician's opinions are not being credited." (internal citations omitted)). Second, the opinions that Mr. Ewen has difficulties with critical thinking, problem solving, and reading and writing were consistent with other medical evidence. Mr. Ewen's February 8, 2018 NeuroTrax exam revealed problem solving impairments (R. 767–73), cognitive therapy notes revealed continued difficulty with complex planning and organization (R. 631–39), and Mr. Ewen repeatedly testified to difficulties reading (R. 46–47, 299, 623, 686). If ALJ Cascio found the evidence conflicting or desired clarification of Dr. Nishat's opinion's applicability in the SSA context, he could have developed the record by seeking an updated opinion from Dr. Nishat or requested a treating source opinion

Finally, although the ALJ stated that Mr. Ewen did not demonstrate debilitating symptoms during the hearing, the hearing transcript does demonstrate that Mr. Ewen was physically uncomfortable due to his pain (R. 49), and also had memory lapses during the hearing (R. 46

("I've been having a little bit of memory loss. I was going to someplace downtown, and they did – I forgot what they did"), 53–54 (when asked about his treating physician's name "I don't remember his name")).

Mr. Ewen's stated activities and appearance at his hearing do not demonstrate that he is not disabled, and it was legal error to fail to evaluate and discuss the rigor of Mr. Ewen's daily activities if they were to form the basis for rejecting Mr. Ewen's stated subjective limitations.  See Archambault v. Astrue, 09 Civ. 6363, 2010 WL 5829378 *30 (S.D.N.Y. Dec. 13, 2010) ("The ALJ also remarked . . . plaintiff's reported activities of daily living, which included self-care, childcare duties, a few household chores, and some pastimes, indicate that 'he is not debilitated.'. . . As the ALJ failed to discuss the rigor of plaintiff's daily activities and presumed that those activities demonstrated a lack of disability, she committed legal error" (citations omitted)), adopted by, 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011).  On remand, the ALJ must engage the required analysis for determining the credibility of a claimant's symptoms and their limiting effects as required by 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) and in doing so must address the supporting, as well as conflicting evidence.

### 3.  Determination of Mr. Ewen's residual functional capacity

Because the Court has already determined, for the reasons discussed above, that remand for further evidentiary proceedings is necessary, the Court need not reach this issue.  Morales v. Colvin, No. 13 Civ. 6844 (LGS) (DF), 2015 WL 13774790, at *23 (S.D.N.Y. Feb. 10, 2015) (court need not reach additional arguments regarding the ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand"), adopted, 2015 WL 2137776 (S.D.N.Y. May 4, 2015).  On remand, the RFC analysis may change based on further development of the

record, an updated Paragraph B analysis, and proper evaluation of Mr. Ewen's subjective complaints.

The Court notes, however, that Courts in this district have found moderate limitations in ability to sit and stand to preclude even sedentary work.  Cooper v. Saul, 444 F. Supp. 3d 565, 579 (S.D.N.Y. 2020) ("Here, it is not 'obvious' that a mild limitation on sitting 'translates into a set number of hours' [citing Perozzi v. Berryhill, 287 F. Supp. 3d 471, 487 (S.D.N.Y. 2018)] . . . [t]here is simply insufficient information in [the consultative examiner's] opinion to allow a finding that Cooper can sit for a six-hour period."); Garretto v. Colvin, 2017 WL 1131906, at *21 (S.D.N.Y. Mar. 27, 2017) ("[The consulting physician's] use of the word 'moderate' is vague and provides no support for the ALJ's conclusion that plaintiff engage in these activities for six hours out of an eight hour day."); Richardson v. Astrue, 2011 WL 2671557, at *12 (S.D.N.Y. July 8, 2011) (consulting doctor's vague conclusion that "[plaintiff's] ability to sit was 'mildly to moderately' impaired . . . provides no support for ALJ's [ ] conclusion that [plaintiff] could perform sedentary work").

## IV.   **CONCLUSION**

For the reasons set forth above, Mr. Ewen's motion for judgment on the pleadings (ECF No. 15) is GRANTED and the Commissioner's motion (ECF No. 20) is DENIED.  The Commissioner's decision denying benefits is vacated, and this matter is remanded to the agency for further proceedings.  The Clerk of Court is respectfully directed to close this case.

Dated:      New York, New York                              SO ORDERED
            March 23, 2021


                                                            _____
                                                            SARAH L. CAVE
                                                            United States Magistrate Judge